**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHRISTINA M. MANN,** *as Co-Executor of the*
*Estate of William K. Mann Jr.*, **WILLIAM K.**
**MANN, III,** *as Co-Executor of the Estate of William*
*K. Mann Jr.*, **VICKI MANN,**

|  |  |
|---|---|
| **Plaintiffs,** | |
| **vs.** | **6:15-CV-645** |
| | **(MAD/ATB)** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **POWERS, SANTOLA LAW FIRM** | **MARGIE A. SOEHL, ESQ.** |
| 39 North Pearl Street - 2ⁿᵈ Floor | **AMBER L. WRIGHT, ESQ.** |
| Albany, NY 12207-2205 | **DANIEL R. SANTOLA, ESQ.** |
| Attorneys' for Plaintiffs | **LAURA M. JORDAN, ESQ.** |
| | |
| **U.S. DEPARTMENT OF JUSTICE** | **JOHN D. HOGGAN JR., ESQ.** |
| 445 Broadway | **KAREN FOLSTER LESPERANCE, ESQ.** |
| James T. Foley Courthouse | |
| Albany, NY 12201 | |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On August 3, 2017, Plaintiffs Christina M. Mann, Vicki Mann, and William K. Mann III

filed a second amended complaint bringing claims for medical malpractice and wrongful death

arising out of a failure to diagnose lung cancer in the decedent, William K. Mann Jr. ("Mr.

Mann"). *See* Dkt. No. 58.[1]  The Court held a bench trial on August 7, 2017, through August 9,

_____

[1] The parties stipulated pursuant to Federal Rule of Procedure 15 to the filing of the
second amended complaint. *See* Dkt. No. 60.

2017.  At the trial, Plaintiffs called two expert witnesses: Dr. Jordan L. Haber, an expert in

radiology; and Dr. Ronald H. Blum, an expert in oncology and internal medicine.  Plaintiffs also

called Vicki Mann, Mr. Mann's surviving spouse, and Donnell Raysor, a family friend, as well as

Mr. Mann's four children: Christina M. Mann, William K. Mann III, Marcus D. Mann, and Alice

A. Mann.  The Government called Dr. Richard Sullivan, who was Mr. Mann's primary care

physician at the Department of Veterans Affairs Outpatient Clinic in Rome, New York.

Additionally, excerpts of two depositions were played for the Court: one of the decedent, Mr.

Mann, and the other of Dr. John C. Sandborn, a radiologist who was employed by the Syracuse

VA Medical Center.

Having reviewed the parties' pre-trial submissions, the trial transcript and exhibits, and the

parties' post-trial briefs, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT[2]

**A.      The Parties and Jurisdiction**

1.      Plaintiff Christina M. Mann was born on June 10, 1987, and is a resident of Utica, New

        York.  *See* Transcript of Trial ("Tr.") at 365.  She is William K. Mann Jr.'s daughter and a

        co-executor of his estate.  *See id.*

2.      Plaintiff William K. Mann III was born on May 14, 1985, and is a resident of Yorkville,

        New York.  *See id.* at 302.  He is William K. Mann Jr.'s son and a co-executor of his

        estate.  *See id.*

3.      Plaintiff Vicki Mann is the widow of William K. Mann Jr.  *See id.* at 108.

---

[2]  Prior to trial, the parties submitted a Joint Pre-Trial Stipulation, which contained certain
stipulated jurisdictional and undisputed facts.  *See* Dkt. No. 46.  The Court's findings of fact are
derived both from the parties' stipulated facts and the Court's findings based upon the trial
transcript and exhibits.

4.  Defendant United States of America owns and operates the Syracuse VA Medical Center in Syracuse, New York.

5.  Plaintiffs sue the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**B.   Medical History**

6.  On May 25, 2011, Mr. Mann was seen by Dr. Richard Sullivan at the Department of Veterans Affairs Outpatient Clinic in Rome, New York.  *See* Dkt. No. 46 at ¶ 2.

7.  Dr. Sullivan performed a new patient physical and ordered a chest x-ray, *see id.* at ¶ 3, and he listed the reasons for the chest x-ray as "baseline, hypertension, smoker," *see* Pls.' Ex. 2 at 58.

8.  On May 25, 2011, Dr. John C. Sandborn was employed as a radiologist by the Syracuse VA Medical Center and interpreted Mr. Mann's chest x-ray within the scope of that employment.  *See* Dkt. No. 46 at ¶¶ 4-5.

9.   In his May 25, 2011 radiology report reviewing Mr. Mann's x-ray, Dr. Sandborn made the following notation: "impression: negative chest."  *See* Pls.' Ex. 2 at 58-59.

10.  Plaintiffs' radiology expert, Dr. Haber, testified that given Mr. Mann's history of smoking the radiologist reviewing his chest x-ray should have been looking for lung cancer, which can present as either a "coin lesion" or a "spiculated lesion."  *See* Tr. at 28-30.

11.  Mr. Mann's May 25, 2011 chest x-ray showed a 1.5 centimeter nodular density in the upper left lobe of his lung.  *See id.* at 36.

12.  The lesion present on Mr. Mann's chest x-ray should have been clearly visible to a radiologist.  *See id.* at 39.

13.    Dr. Haber and Dr. Ronald Blum, Plaintiffs' oncology expert, testified that the lesion
present in Mr. Mann's May 25, 2011 x-ray indicated that Mr. Mann had cancer and that a
CAT scan was required in order to prove otherwise. *See id.* at 37, 259-60.

14.    Upon discovering the lesion in Mr. Mann's x-ray, a radiologist following the standard of
care would have communicated that finding to the patient's doctor and advised that a CAT
scan would be necessary. *See id.* at 36.

15.    Dr. Sandborn's interpretation of Mr. Mann's chest x-ray was a departure from good and
accepted medical practices for a radiologist in New York State in 2011. *See id.* at 42-43.

16.    Dr. Blum stated that he had a reasonable degree of medical certainty that Mr. Mann's
lesion was stage 1A lung cancer as of May 25, 2011, and that it was not metastatic. *See
id.* at 237.

17.    If Mr. Mann's lung cancer had been diagnosed in May 2011, then it would likely have
been surgically removed and he would not have required any further treatment in order to
achieve a seventy percent probability of cure. *See id.* at 237.

18.    In January 2014, Mr. Mann was hospitalized for multiple days at Rome Memorial
Hospital and a chest x-ray was performed, which showed a lesion described in a report as
"a vague area of nodularity" measuring 2.2 centimeters. *See id.* at 263.

19.    There is no evidence that Rome Memorial Hospital communicated to Mr. Mann's doctors
at the VA hospital that there was evidence of malignancy. *See id.* at 267.

20.    Dr. Blum stated that it was his opinion, with a reasonable degree of medical certainty, that
Mr. Mann already had stage IV metastatic lung cancer as of January 2014. *See id.* at 254.

21.    Mr. Mann was not diagnosed with cancer until July 2014 when he was diagnosed with
stage IV metastatic lung cancer that had spread into his spine. *See id.* at 238.

22.   When his cancer was diagnosed on July 25, 2014, it was inoperable and, according to Dr. Blum, it was "basically incurable," with a fourteen percent probability of long-term survival.  *See id.* at 244.

23.   As part of his treatment, Mr. Mann underwent kyphoplasty, which is an attempt to reinforce the bones in the back to prevent impingement on the spinal cord and potential paralysis.  *See id.* at 245; Pls.' Ex. 5 at 989, 1007-08.

24.   Mr. Mann was also treated with four cycles of chemotherapy, which were intended to relieve symptoms but not necessarily to impact survival; the treatment was palliative not curative.  *See* Tr. at 245, 248.

25.   Although the chemotherapy shrunk the primary tumor by a small amount, Mr. Mann had persistent pain in his back because of the metastases impinging on nerves in that area.  *See id.* at 246.

26.   To treat Mr. Mann's back pain, he underwent stereotactic radiation to his spine, *see id.* at 246; Pls.' Ex. 5 at 989, and he began using a wheelchair for transportation, *see* Pls.' Ex. 24 at 20:47-22:14.

27.   Despite the kyphoplasty and radiation, Mr. Mann was hospitalized numerous times for severe back pain; he was also hospitalized for abdominal pain, general weakness, failure to thrive, and other reasons.  *See* Pls.' Ex. 13 at 3, 12; Pls.' Ex. 5 at 1537, 1607, 2231, 2290, 2389, 3262, 3279, 3511.

28.   Mr. Mann developed signs and symptoms of brain metastases and began palliative radiation to the brain on August 31, 2015.  *See* Tr. at 247-48.

29.   In November 2015, imaging studies showed new matastases in the lungs and liver.  *See id.* at 250.

30.    As a result of his cancer—as well as the radiation and multiple rounds of chemotherapy he underwent to treat the cancer—Mr. Mann struggled with nausea, shortness of breath, and extreme fatigue.  *See id.* at 250-52.

31.    Mr. Mann also had extreme pain that is characteristic of bone metastases; his pain was treated with substantial doses of narcotics, but they did not control the pain.  *See id.* at 252-53.

32.    In January 2016, Mr. Mann became extremely ill with a failing respiratory system and he was intubated.  *See id.* at 250.

33.    Mr. Mann chose to undergo another round of chemotherapy even though it was very unlikely to benefit him.  *See id.* at 251.

34.    Mr. Mann died on March 3, 2016.  *See* Dkt. No. 46 at ¶ 8.

**B.    Personal History**

35.    Mr. Mann was born on June 10, 1958.  *See* Dkt. No. 46 at 2.

36.    Mr. Mann was the father of four adult children: William Mann III, born in 1985; Marcus Mann, born in 1986; Christina Mann, born in 1987; and Alice Mann, born in 1990.  *See* Tr. 302, 365, 393, 421.

37.    At the time of his death, Mr. Mann was married to Vicki Mann, who he began dating in November 2001 and married on April 25, 2009.  *See id.* at 109.  Vicki Mann has three adult children of her own, who are not related to Mr. Mann.  *See id.* at 116.

38.    Mr. Mann had a bachelor's degree from SUNY Polytechnic Institute and had worked as a substitute teacher and as an aide at a center for foster children after receiving his degree.  *See id.* at 113-14.

39. At the time of Mr. Mann's diagnosis, he was receiving Social Security Disability Benefits due to a back injury from an automobile accident that occurred in 1992. *See id.* at 111-12; Def.'s Ex. A at 12.

40. Since that car accident, Mr. Mann had complained of chronic back pain, took prescribed controlled substances, and at times used a cane. *See* Def.'s Ex. A at 12; Tr. at 343-45, 416-17, 457-58.

41. Mr. Mann had a history of drug and alcohol abuse, including a history of substance abuse treatment. *See* Pls.' Ex. 2A at 1079-84; Def.'s Ex. D at 8:44-10:42.

42. Mr. Mann tested positive for cocaine multiple times at primary care appointments and other doctors visits between 2010 and early 2014. *See* Def.'s Ex A at 1; Pls.' Ex 2A at 1096, 1146, 1150.

43. Prior to his cancer diagnosis, Mr. Mann reported having a history of depression. *See* Def.'s Ex. A at 8; Pls.' Ex. 2A at 1295-97.

44. In consultations with medical personnel in May 2011 and January 2014, Mr. Mann reported suicidal ideation. *See* Pls.' Ex. 2A at 1098-99, 1031-33. Mr. Mann also reported attempting suicide. *See id.* at 1098.

45. Mr. Mann's marriage with Vicki Mann was coming to an end before he was diagnosed with cancer, and he had already initiated divorce proceedings; Mr. Mann stated in a deposition that he believed they would have been divorced had he not been diagnosed with cancer. *See* Def.'s Ex. D at 0:15-1:30, 11:58-15:03; Tr. 355, 420.

46. During the course of their marriage, Mr. Mann and Vicki Mann lived separately on multiple occasions, including September 2015 until Mr. Mann's death in March 2016. *See id.* at 11:58-15:03; Tr. 132, 410.

47. In counseling sessions between July 2013 and August 2015, Mr. Mann frequently referred to Vicki Mann as his "estranged wife." *See* Pls.' Ex. 2A at 887, 911, 925, 939-40, 955-60, 1019, 1079-84.

48. When Mr. Mann lived with Vicki Mann, he did a variety of work in and around their apartment, including maintenance, painting, and mechanical work, as well housework and cooking. *See* Tr. at 143-44.

49. As a result of Mr. Mann's death, Vicki Mann is receiving a $1,254 per month from the VA, which she will receive for the rest of her life. *See id.* at 217.

50. Each of Mr. Mann's four children testified to having a close relationship with their father, and stated that Mr. Mann provided them with advice, guidance, small amounts of money, and other types of assistance. *See* Tr. at 316, 326, 377-79, 396-401, 423-25.

51. William Mann III moved out of his father's house in 2005, shortly after graduating high school, but he moved back in with his father on two occasions: he stayed with his father for a year after losing a job in 2012, and again in 2014 when he was recovering from ankle surgery. *See id.* at 309

52. Mr. Mann also helped William Mann III in other ways—Mr. Mann occasionally gave his son small amounts of cash, babysat his children, and once helped him buy a car. *See id.* at 314, 324.

53. Marcus Mann is a father to five children, and Mr. Mann frequently provided babysitting services for Marcus. *See id.* at 394. Marcus also received occasional financial help from his father, who purchased a car and a phone for Marcus and clothing and toys for his children. *See id.* at 394, 397-98,

54.   Christina Mann also received various types of assistance from her father, including help with college applications and school work, as well as pocket money and occasional financial help when she needed it.  *See id.* at 367-68.  Christina moved in with Mr. Mann in 2015 after he was diagnosed with cancer.  *See id.* at 369.

56.   Alice Mann lived with her father until graduating from SUNY Polytechnic Institute in 2013, and Mr. Mann helped her with her application and financial aid issues.  *See id.* at 422-23.  Alice moved to Washington D.C. after college, but spoke with her father nearly every day and he provided guidance and advice.  *See id.* at 424.

57.   After his cancer diagnosis, Mr. Mann struggled with various physical ailments that required numerous hospitalizations, as well mental anguish caused by the knowledge of his impending death.  *See id.* at 249-53.

58.   According to William Mann III, Mr. Mann transformed from an outgoing, energetic, and upbeat person into the "complete opposite of the person he was before."  *See id.* at 330.  He isolated himself and was exhausted, sad, and angry.  *See id.*

59.   Despite the pain caused by his underlying disease and the side effects of his treatments, Mr. Mann requested an additional round of chemotherapy that was not likely to be helpful, and he asked to be intubated and resuscitated.  *See id.* at 251.

59.   At his August 12, 2015 deposition, Mr. Mann stated "I'm not done.  I still have life.  I still have my children and my grandchildren, and I'm not ready to leave them yet.  I'm not ready.  I've got to fight as much as possible so I can be there for them."  *See* Pls.' Ex. 24 at 23:25-24:00.

60.     Mr. Mann's will stated that he wanted his "body [to] be buried in a Christian like manner and that [his] four children . . . be able to come together and decide what to put on the stone that will be placed on [his] grave."  *See* Def.'s Ex. G at 1.

### III.  CONCLUSIONS OF LAW

**A.     Legal Standard**

"In a bench trial such as this, it is the Court's job to weigh the evidence, assess credibility, and rule on the facts as they are presented."  *Bahrami v. Ketabchi*, No. 05 Civ. 3829, 2009 WL 513790, *9 (S.D.N.Y. Feb. 27, 2009) (quoting *Johnson-McClean Techs. v. Millennium Info. Tech. Grp.*, No. 02 Civ. 244, 2003 WL 192175, *8 (S.D.N.Y. Jan. 27, 2003)) (internal quotation marks and alterations omitted); *see also Mathie v. Fries*, 121 F.3d 808, 811-12 (2d Cir. 1997).  "The Court [is] 'in the best position to evaluate [each] witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says.'"  *Bahrami*, 2009 WL 513790, at *9 (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 634 (2d Cir. 1996)); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (noting that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said").  If the "evidence is equally divided . . . 'the party with the burden of proof losses.'"  *Bahrami*, 2009 WL 513790, at *9 (quoting *U.S. v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994)); *see also Fulop v. Malev Hungarian Airlines*, 244 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (finding that "[t]he evidence on this issue is substantially divided and, in the Court's assessment, does not tilt sufficiently to Plaintiff's case to satisfy the preponderance standard").

**B.     Medical Malpractice and Wrongful Death**

*1. Liability*

Under Section 5-4.1 of the New York Estates Powers and Trusts Law, "a personal representative of a decedent may maintain a wrongful death action provided the defendant 'would have been liable to the decedent by reason of such wrongful conduct if death had not ensued.'" *Coolidge v. United States*, No. 10-CV-363, 2015 WL 5714237, *5 (W.D.N.Y. Sept. 29, 2015) (quoting *LaMarca v. United States*, 31 F. Supp. 2d 110, 124 (E.D.N.Y. 1998)).  "This language means 'that no action may be maintained by the representative unless the decedent, at the time of his death, could have maintained an action for the underlying tort.'" *LaMarca*, 31 F. Supp. 2d at 120 (quoting *Dundon v. United States*, 559 F. Supp. 469, 475-76 (E.D.N.Y. 1983)).  To establish wrongful death based on medical malpractice, a plaintiff must prove that the malpractice was the proximate cause of death.  *See Dentes v. Mauser*, 91 A.D.3d 1143, 1144 (3rd Dep't 2012).

"Under New York law, a medical malpractice plaintiff must prove '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.'"  *Stelman v. United States*, No. 14-CV-5363, 2016 WL 5315196, *12 (S.D.N.Y. Sept. 21, 2016) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994)). Additionally, "'except as to matters within the ordinary experience and knowledge of laymen,' an expert medical opinion 'is required to make out both of these elements.'" *Id.* (quoting *Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995)).  Here, Plaintiffs established both prongs of their medical malpractice claim at trial.

First, Plaintiffs showed that the treatment Mr. Mann received did not meet the standard of care in New York.  The Second Circuit has provided the following guidance regarding the standard of care:

> A physician's obligations to his patient are to possess at least the degree of knowledge and skill possessed by the average member of the medical profession in the community in which he practices, to exercise ordinary and reasonable care in the application of that

> professional knowledge and skill, and to use his best judgment in
> the application of his knowledge and skill.

*Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987).  Plaintiffs called Dr. Jordan L. Haber, a board-certified radiologist with decades of experience, to provide expert medical testimony regarding Dr. Sandborn's interpretation of Mr. Mann's May 25, 2011 x-ray.  Dr. Haber testified that the failure to identify the lesion in Mr. Mann's May 25, 2011 chest x-ray and to order follow-up testing constituted a departure from good and accepted medical practices for a radiologist in New York State in 2011.  Tr. at 44.  The Government did not provide any expert testimony to contradict Dr. Haber's opinion.

Second, Plaintiffs also established that the failure to meet the standard of care was a proximate cause of Mr. Mann's death.  "A defendant's negligence qualifies as a proximate cause where it is 'a substantial cause of the events which produced the injury.'"  *Mazella v. Beals*, 27 N.Y.3d 694, 706 (2016) (quoting *Derdiarian v. Felix Contr. Corp.*, 51, N.Y.2d 308, 315 (1980)).  "When a question of proximate cause involves an intervening act, 'liability turns upon whether the intervening act is a *normal or foreseeable consequence* of the situation created by the defendant's negligence.'"  *Hain v. Jamison*, 28 N.Y.3d 524, 529 (2016) (quoting *Mazella*, 27 N.Y.3d at 706).

Dr. Ronald Blum, an oncologist with particular expertise in lung cancer, was called by Plaintiffs to testify about the issue of proximate cause.  According to Dr. Blum, Mr. Mann had Stage 1A lung cancer at the time of his May 25, 2011 chest x-ray, and he would have had a seventy percent chance of survival at five years through surgical treatment alone.  *See* Tr. at 237.  By the time Mr. Mann's cancer was ultimately diagnosed in July 2014, he had Stage IV metastatic cancer that was essentially untreatable.  *See id.* at 238, 242.  Once again, the Government did not provide an expert witness to contradict Dr. Blum's testimony.  However, in its post-trial brief, the Government argues that Rome Hospital's failure to diagnose Mr. Mann's lung cancer in January

12

2014—just six months before he was eventually diagnosed—was an "intervening causal event." *See* Dkt. No. 75 at 3-4. The Court disagrees. Dr. Blum testified that Mr. Mann already had Stage IV metastatic cancer when the x-ray was taken in January 2014, and the Government provided no expert medical testimony contradicting Dr. Blum's opinion. *See* Tr. at 254.

The Government contested liability at trial and in its post-trial brief, but it would have been prudent for the Government to admit liability. The Government did not call a single witness to refute liability. In the Court's view, the medical malpractice of the defendant is flagrant, totally below any acceptable level of care, and in this case it was fatal. The attempt by the Government to argue that Rome Hospital's similarly unacceptable failure to diagnose the lung tumor was an intervening cause is disingenuous, as the actual diagnosis of lethal lung cancer was made only six months later and Plaintiffs' expert stated that at the time Rome Hospital performed the chest x-ray, Mr. Mann's diagnosis was already Stage IV metastatic cancer. At that time, the Court concludes that Mr. Mann was already a dead man walking. For all of the aforementioned reasons, the Court finds that Plaintiffs proved their claim of medical malpractice and wrongful death.

### 2. Damages

#### a. Conscious Pain and Suffering

After his diagnosis in July 2014, Mr. Mann lived for approximately twenty months until his death in March 2016. Over the course of those twenty months, Mr. Mann endured enormous pain and suffering. He underwent radiation to the spine and brain, as well as several rounds of chemotherapy; he was admitted to the hospital numerous times for back pain, stomach pain, and general weakness; he suffered extreme pain due to bone metastases; and Mr. Mann was forced to use a wheelchair. In addition to his many physical symptoms, Mr. Mann also showed signs of emotional suffering and the mental anguish of impending death; he became isolated, sad,

exhausted, and angry.  Mr. Mann lived day after day with no hope.  Despite all of that—and despite Mr. Mann's pre-existing depression and mental health problems—he expressed that he wanted to take every step to preserve his life for as long as possible.  Mr. Mann requested additional chemotherapy even when it was very unlikely to help, and he asked to be intubated and resuscitated even though such measures would ultimately be futile.  Although Mr. Mann had a substance abuse problem, he was honest about those issues, he was confronting them, and he continued living his life and caring for his children.

In comparable cases, plaintiffs have been awarded a range of damages awards for conscious pain and suffering.  In *Mandel v. New York County Public Administrator*, 29 A.D.3d 869, 870 (2d Dep't 2006), the plaintiff's doctors failed to diagnose her lung cancer and she lived for approximately 24 months after eventually being diagnosed.  The Second Department upheld the jury's award of $2,000,000 in damages for pain and suffering.  *See id.*  In *Birbeck v. Central Brooklyn Medical Group*, No. 4598/97, 2001 WL 1154985, *3 (N.Y. Sup. Ct. Aug. 22, 2001), the plaintiff's doctor failed to diagnose lung cancer and he lived for approximately four months after his eventual diagnosis.  The jury awarded $1,000,000 in conscious pain and suffering, which the trial judge reduced to $750,000, finding that "$750,000 . . . for the pain and suffering of a 64-year-old decedent suffering for months from belatedly diagnosed, advanced lung cancer reasonable compares with other pertinent cases."  *See id.*  In this case, the Court finds that $1,250,000 is an appropriate award for Mr. Mann's conscious pain and suffering.

### b. Mr. Mann's Children

It is well established in New York that financially independent adult children may recover pecuniary damages under New York's wrongful death statute.  *See Gonzalez v. N.Y.C. Hous. Auth.*, 77 N.Y.2d 663, 668-89 (1991).  "In the case of a decedent who was not a wage

earner, 'pecuniary injuries' may be calculated, in part, from the increased expenditures required to continue the services [he or she] provided, as well as the compensable losses of a personal nature, such as guidance." *Hyung Kee Lee v. N.Y. Hosp. Queens*, 118 A.D.3d 750, 754 (2d Dep't 2014) (quoting *Gonzalez*, 77 N.Y.2d at 668).

Mr. Mann did not provide his children with huge sums of money or regular financial assistance.  However, Mr. Mann did provide some financial help to his children, as well as advice, guidance, and other compensable services.  Therefore, the Court finds that Mr. Mann's children—William Mann III, Marcus Mann, Christina Mann, and Alice Mann—are entitled to $25,000 each in pecuniary damages.  *See Rubin v. Aaron*, 191 A.D.2d 547, 547 (2d Dep't 1993) (reducing a pecuniary damages award from $100,000 to $25,000 in a wrongful death case for an adult daughter who "relied heavily upon the decedent for advice and guidance").

### C. Vicki Mann

New York common law does not recognize causes of action to recover damages for wrongful death separate from the statutory cause of action accorded to a decedent's distributees. *See Liff v. Schildkrout*, 49 N.Y.2d 622, 631-32 (1980) (citing N.Y. E.P.T.L. § 5-4.1). A surviving spouse, in her individual capacity, does not have a claim for loss of consortium due to her spouse's death.  *See id.*, at 631.  The surviving spouse can, however, recover for loss of consortium for the period prior to the decedent's death, which is a derivative action of the decedent's claim for conscious pain and suffering.  *See id.* at 632.  The phrase "loss of consortium" generally refers to grief, loss of society, affection, and conjugal fellowship.  *See Ruiz v. N.Y.C. Health & Hosps. Corp.*, 165 A.D.2d 75, 80 (1st Dep't 1991) (citing *Liff*, 49 N.Y.2d at 633).

In this case, Vicki Mann is entitled to damages for loss of consortium during the approximately twenty months between Mr. Mann's cancer diagnosis and his death, as well as pecuniary damages for wrongful death. *See* Dkt. No. 73 at 14. Mr. Mann and Vicki Mann were in a long-term relationship; they had been married since 2008, dating since 2001, and she continued to have a presence in his life even after she moved out of their apartment in September 2015. Tr. at 357. However, it is clear that problems in their marriage had arisen well before Mr. Mann's cancer diagnosis and that Mr. Mann had initiated divorce proceedings prior to his diagnosis. The Court is not persuaded by Plaintiffs' argument that the problems in the marriage were caused by changes in Mr. Mann's behavior resulting from his disease. *See* Dkt. No. 73 at 12-13. Similarly, the Court does not believe Vicki Mann's testimony that Mr. Mann never mentioned divorce prior to his diagnosis. Tr. at 137. The Court finds that a total award of $20,000 in damages for Vicki Mann is appropriate in this case.

### d. Loss-of-Chance Doctrine

The Government argues that Plaintiffs' damages award should be reduced according to the loss-of-chance doctrine. *See* Dkt. No. 75 at 18-19. Mr. Mann already had Stage I lung cancer at the time of the medical malpractice in January 2011, and Dr. Blum testified that his likelihood of survival was approximately seventy percent if he had been diagnosed and treated at that time. Therefore, the Government argues, Plaintiffs are not entitled to the full amount of total damages caused by Mr. Mann's disease. *See id.* In support of this position, the Government cites to *Birbeck v. Central Brooklyn Medical Group*, No. 4598/97, 2001 WL 1154985, *3 (N.Y. Sup. Ct. Aug. 22, 2001), which states that "a physician should be subject to liability only to the extent that he contributed to the harm. Therefore, the amount of damages recoverable should be equal to the percent of chance lost multiplied by the total value of a complete recovery." *See id.* (quoting

*Jorgenson v. Vener*, 616 N.W.2d 366, 371 (S.D. 2000), *abrogated by* S.D. Codified Laws § 20–9–1.1.  But the Court has serious doubts about whether *Birbeck* represents the state of the law in New York.

The loss-of-chance doctrine is an approach to causation that is primarily used in medical malpractice cases.  The doctrine "permits plaintiffs to recover damages for the reduction in the odds of recovery attributable to a defendant," even when that reduction is less than fifty percent.  *Crosby v. United States*, 48 F. Supp. 2d 924, 926 (D. Alaska 1999).[3]  In New York, *Kallenberg v. Beth Israel Hospital*, 45 A.D.2d 177 (1st Dep't 1974), was the seminal case establishing a cause of action for the loss of chance.  In *Kallenberg*, the plaintiff was permitted to recover for a less than forty percent loss of chance of survival caused by a doctor's medical malpractice.  *See id.* at 179-80.

The states that have adopted the loss-of-chance doctrine "have taken varying views on whether full damages are recoverable, or whether damages should be reduced so as to reflect the amount of chance that was lost."  *McKain v. Bisson*, 12 F.3d 692, 696 (7th Cir. 1993) (citing Martin J. McMahon, Annotation, *Medical Malpractice: Measure and Elements of Damages in Actions Based on Loss of Chance*, 81 A.L.R. 4th 485 (1990)).  Courts in New York state have not adopted a mathematical formula for quantifying damages based on the value of the lost chance, such as the formula proposed in *Birbeck*.  *See* Lee S. Kreindler, *New York Law of Torts* § 8:21 (August 2017 Update) (noting that New York is among the states that "award damages for the

---

[3] While the reduction may be less than fifty percent, it is not entirely clear what reduction in chance is sufficient.  New York courts have generally adopted the standard that medical malpractice claims based on loss of chance are actionable when plaintiffs are deprived of a "substantial possibility" of recovery.  *See Clune v. Moore*, 142 A.D.3d 1330, 1331 (4th Dep't 2016); *Candia v. Estepan*, 289 A.D.2d 38, 39 (1st Dep't 2001); *Kimball v. Scors*, 59 A.D.2d 984, 985 (3d Dep't 1977).

actual death or aggravated injury" rather than "the total value of the lost chance").  Indeed, the

plaintiff's recovery in *Kallenberg* was not reduced based on the percent of chance lost.  *See*

*Kallenberg*, 45 A.D.2d at 178.[4]

In this case, however, the Court need not consider how the loss-of-chance doctrine might

impact the calculation of damages.  Plaintiffs' expert stated that the failure to diagnose Mr.

Mann's lung cancer reduced his chance of survival from seventy percent to fifteen percent.  As

medical malpractice was more likely than not the cause of Mr. Mann's death, Plaintiffs did not

rely on the loss-of-chance doctrine to establish causation.  Therefore, the Court declines the

Government's request to reduce the damages in this case.

### IV. FUNERAL EXPENSES AND MEDICAL BILLS AND

Plaintiffs provided the Court with an invoice stating that Mr. Mann's funeral expenses

amounted to $7,327.  *See* Pls.' Ex. 22.  The Government has stipulated to adding this amount to

any damages award in the event that liability is found.  *See* Dkt. No. 75 at 15.  Therefore, the

Court will add $7,327 to the total damages award.

As for Mr. Mann's medical bills, the parties appear to have come to an agreement, but the

Court requires further clarification.  The Government states that the federal government has

already paid for Mr. Mann's medical expenses—either through Medicare, the VA, or

CHAMPVA, a comprehensive health care benefits program administered by the VA—and the

---

[4] Even where courts have reduced damages in loss-of-chance cases, they do not do so in
proportion to the chance lost.  In *Stewart v. New York City Health & Hospitals Corp.*, 207 A.D.2d
703 (1st Dep't 1994), a plaintiff had a ten percent chance of conceiving a child through sexual
intercourse, but that chance was lost due to medical malpractice.  The jury in that case awarded
the plaintiff $500,000, but the Appellate Division reduced that award to $300,000.  *See id.* at 704.
Even though the loss of chance was just ten percent, the court did not reduce the plaintiff's
damages award in proportion to her loss of chance; instead, the court explained that the reduced
damages "more adequately compensate[d] plaintiff for her injury."  *See id.*

Government therefore will not reimburse Mr. Mann's medical expenses. *See* Dkt. No. 75 at 14. However, to the extent that Plaintiffs' damages award is subject to a federal government lien arising from Mr. Mann's medical expenses, the Government agrees to either release the lien or to add the lien amount to any judgment issued by the Court. *See id.*

Plaintiffs have submitted records of Mr. Mann's medical bills, but both the records and the accompanying letter are unclear. *See* Dkt. No. 72. First, the letter itself is not clear in regard to the nature of the stipulation regarding medical expenses. *See id.* Second, the letter states the following: "I have gone through the list and believe that none of the VA expenses are duplicates of payments made by Medicare. I, therefore, feel the total amount of medical expenses to be $529,337.65; and Medicare is $[SIC] $91,757.10. The VA spreadsheet totals $529,337.65." *See id.* The Court cannot determine whether the total medical expenses are meant to be the sum of the VA expenses and the Medicare expenses ($621,094.75) or whether the total expenses are, as Plaintiffs assert, the same amount as the VA spreadsheet ($529,337.65). Therefore, Plaintiffs' request for medical expenses is denied with leave to refile. Both Plaintiffs and the Government must submit letters to the Court within fourteen days clearly explaining their positions with respect to Mr. Mann's medical expenses.

## VI. CONCLUSION

After carefully reviewing the parties' pre-trial submissions, the trial transcript and exhibits, and the parties' post-trial briefs, the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs are awarded $1,377,327 in total damages, consisting of $1,250,000 in pain and suffering; $25,000 in pecuniary damages to each of Mr. Mann's four

children for a total of $100,000; $20,000 in damages to Vicki Mann; and $7,327 in funeral

expenses; and the Court further

ORDERS that Plaintiffs' request for medical expenses (Dkt. No. 72) is **DENIED with**

**leave to refile**, and both parties must submit letters to the Court within **fourteen (14) days** clearly

explaining their positions in regard to Mr. Mann's medical expenses; and the Court further

ORDERS that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: January 11, 2018
      Albany, New York

Mae A. D'Agostino
U.S. District Judge